FILED

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
**Alexandria, Virginia**

2014 APR -7 P 1: 54

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| TWENTIETH CENTURY FOX FILM CORPORATION, DISNEY ENTERPRISES, INC., PARAMOUNT PICTURES CORPORATION, UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, COLUMBIA PICTURES INDUSTRIES, INC., and WARNER BROS. ENTERTAINMENT INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> MEGAUPLOAD LIMITED, VESTOR LIMITED, KIM DOTCOM, MATHIAS ORTMANN, and BRAM VAN DER KOLK, <br><br> *Defendants.* | Case No. 1:14-CV-00362 (LO/IDD) |

## COMPLAINT FOR COPYRIGHT INFRINGEMENT

Plaintiffs Twentieth Century Fox Film Corporation ("Fox"), Disney Enterprises, Inc. ("Disney"), Paramount Pictures Corporation ("Paramount"), Universal City Studios Productions LLLP ("Universal"), Columbia Pictures Industries, Inc. ("Columbia"), and Warner Bros. Entertainment Inc. ("Warner"), by and through their counsel, on personal knowledge as to their own actions and on information and belief as to the actions, capabilities, and motivation of others, hereby allege as follows:

### Nature Of The Case

1.      Until January 2012, when defendants were indicted on federal charges, defendants operated the notorious website and service located at www.Megaupload.com ("Megaupload" or

"Megaupload website") as a commercial online hub for publicly providing popular copyrighted content, including thousands of plaintiffs' copyrighted works, over the Internet to millions of Megaupload users without authorization or license. On a daily basis, defendants intentionally infringed plaintiffs' copyrighted motion picture and television programs on a massive scale and for a substantial profit. Defendants carried out this intentional, large-scale theft of plaintiffs' intellectual property primarily through the operation of the Megaupload website, as well as associated websites like the video streaming service located at www.Megavideo.com ("Megavideo").

2.      Defendants intentionally and actively encouraged their users to upload to the Megaupload computer servers infringing copies of the most popular entertainment content, including plaintiffs' copyrighted television shows and movies. For example, through Megaupload's "Uploader Rewards" program, defendants openly paid Megaupload users money to upload popular unauthorized and unlicensed content, including plaintiffs' copyrighted television shows and movies, onto Megaupload's computer servers. Pursuant to the Uploader Rewards program, the more often an uploaded file was downloaded by other users, the more money the uploader made.

3.      Once a Megaupload user uploaded a file, defendants provided that user with a "link" to the infringing content and encouraged the user to disseminate the "link" as broadly as possible on the Internet so that as many people as possible would find the link and use it to download the infringing content from Megaupload's servers.

4.      Defendants profited handsomely from this copyright infringement in at least two ways: by selling users "premium" subscriptions, which enabled rapid, unrestricted downloading; and by selling online advertising space to advertisers.

2

5.    The large amounts of popular entertainment content on Megaupload attracted many users who were willing to purchase Premium Subscriptions so that they could access that content quickly and easily. Premium subscriptions cost between a few dollars per day and approximately $260 for a lifetime, and defendants earned an estimated $150 million from the sale of premium subscriptions.

6.    The large inventory of popular entertainment content available illegally on Megaupload generated an exceptionally high volume of traffic, which made Megaupload useful to ad networks seeking to generate large volumes of impressions. To cash in on this additional opportunity to make money, defendants actively sold advertising space on Megaupload's web pages. Defendants earned more than $25 million through online advertising on Megaupload and its associated websites.

7.    Contrary to some of defendants' public assertions, Megaupload was not designed to be a private data storage provider. Users without premium subscriptions were restricted not only in their downloading capabilities, but also in their ability to store files on the site. Any content they uploaded would be deleted if it was not also downloaded within a certain period of time – after 21 days in the case of unregistered, anonymous users and after 90 days in the case of registered users who were not premium subscribers. Only premium subscribers (estimated to be 1% of users) could use Megaupload for long-term file storage. Thus, by design, Megaupload functioned not as a private online storage locker, but rather as a hub for uploading and downloading infringing copies of popular movies and television shows, including plaintiffs' copyrighted works.

8.    As a direct result of the popularity of the infringing copyrighted content that defendants solicited and propagated, defendants' business was extraordinarily successful and

3

profitable. Megaupload was at one point in its history estimated to be the 13th most frequently visited website on the entire Internet. The site claims to have had more than one billion visitors, more than 180,000,000 registered users, an average of 50 million daily visits, and at one point to have accounted for approximately four percent of the total traffic on the Internet.

9.      Defendants' infringement-driven profits came at enormous costs to plaintiffs and other copyright owners. Defendants were responsible for the infringement of thousands of plaintiffs' copyrighted works, causing substantial harm to plaintiffs, who invested billions of dollars and enormous creative energies to produce their copyrighted works.

10.     Due to their conduct, defendants are liable to plaintiffs for copyright infringement. Defendants are liable for direct infringement of plaintiffs' copyrighted works. Defendants are further liable for inducement of infringement, contributory infringement and vicarious infringement, for actively promoting, enabling, and profiting from the copyright infringement of Megaupload users.

## Jurisdiction And Venue

11.     This is a civil action seeking damages and defendants' profits for copyright infringement under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(a) (jurisdiction over copyright actions).

13.     This Court has personal jurisdiction over defendants because this action concerns defendants' operation of a commercial business, Megaupload, through which defendants knowingly and with manifest intent transacted business and entered into contracts with residents of Virginia and this District. The Megaupload website was freely accessible to Virginia residents and defendants in fact sold Megaupload subscriptions to Virginia residents, made

payments to Virginia residents under the Uploader Rewards program, and provided infringing copies of plaintiffs' works to Virginia residents.

14.     Furthermore, this Court has personal jurisdiction over defendants because they entered into a long-term, ongoing business arrangement with a Virginia corporation – Carpathia Hosting, Inc. ("Carpathia") – that is headquartered in Dulles, Virginia, and that provided defendants with Internet hosting services for Megaupload.  Those services included providing more than 1,000 computer servers to Megaupload, at least 525 of which were located at a Carpathia facility in Ashburn, Virginia, within this District.  Carpathia's Internet hosting services were essential to the operation of Megaupload, the infringement of plaintiffs' copyrighted works, and the enormous profits reaped by defendants.  Each day, hundreds of thousands of files – including infringing copies of plaintiffs' works – were uploaded to and downloaded from the Virginia-based Carpathia servers operated and controlled by defendants.  In exchange for Carpathia's hosting services, defendants made regular payments to Carpathia totaling more than $35 million.  Currently, all of the more than 1,000 servers that Carpathia leased to Megaupload are located in Harrisonburg, Virginia, within this District.  Moreover, under the standard terms of Carpathia's service agreements with its customers, defendants agreed to indemnify Carpathia for any liability for copyright infringement occurring on the Megaupload servers that Carpathia leased to defendants, and further consented to personal jurisdiction of the state and federal courts in Loudoun County, Virginia, with respect to any disputes arising out of the agreement.

15.     Personal jurisdiction over the individual defendants also is proper because, at times relevant to this Complaint, each defendant worked with or acted in concert with the other defendants to operate Megaupload and/or facilitate its and its users' copyright infringement in Virginia and this District, and each also profited from that infringement.  Furthermore, the

5

individual defendants had direct involvement in Megaupload's contractual relationship with Carpathia and in the operation and control of the Megaupload servers in this District.

16.     Venue in this District is proper under 28 U.S.C. § 1391(b), (c), (d) and/or 28 U.S.C. § 1400(a).  Defendants reside in this District, *id.* § 1391(c), and a substantial part of the acts of infringement complained of herein has occurred in this District, *id.* § 1391(b).

## The Parties

### *The Plaintiffs*

17.     Plaintiffs Fox, Disney, Paramount, Universal, Columbia, and Warner, or their affiliates, are among the leading motion picture studios in the world, and are responsible for creating and distributing some of the world's most popular entertainment content.

18.     Each of the plaintiffs owns or controls the copyrights and/or exclusive rights under copyright to thousands of popular motion pictures and television programs infringed by defendants, including for illustrative purposes those listed in Exhibit A hereto.

### *The Defendants*

19.     Defendant Megaupload Limited is a registered company in Hong Kong, and is the registered owner of Megaupload.com, the primary website operated by defendants, and Megaclick.com, a site that offered advertising services on defendants' websites.

20.     Defendant Kim Dotcom, aka Kim Schmitz, aka Kim Tim Jim Vestor, is a resident of both Hong Kong and New Zealand, and a dual citizen of Finland and Germany.  Dotcom founded Megaupload Limited and, until on or about August 14, 2011, was its Chief Executive Officer.  Dotcom supervised the development of Megaupload.com and its associated websites and administered the Megaupload.com domain name.  Dotcom also personally negotiated Megaupload's contract with Carpathia.  In addition, Dotcom is the director and sole shareholder

of Vestor Limited, through which he owns the majority share of Megaupload Limited. Dotcom personally participated in and directed, and profited from, the infringing actions of Megaupload Limited, as alleged in this complaint. In 2010 alone, Dotcom received more than $42 million from his involvement with Megaupload Limited.

21.     Defendant Vestor Limited ("Vestor") is a registered company in Hong Kong. Vestor is the majority shareholder of Megaupload Limited. Dotcom is the sole director and shareholder of Vestor. Vestor is also the sole shareholder of Megamedia Limited, which is the parent company and sole shareholder of Megavideo Limited, the registered owner of Megavideo.com.

22.     Defendant Mathias Ortmann ("Ortmann") is a citizen of Germany and a resident of both Germany and Hong Kong. Ortmann is the Chief Technical Officer, co-founder, and a director of Megaupload Limited. As the director and sole shareholder of Netplus International Limited LLC, Ortmann effectively owns 25% of the shares of Megaupload Limited. Ortmann was extensively involved in the technical operations of Megaupload, including (for example) overseeing the software programmers who developed Megaupload, handling technical issues with Internet Service Providers, setting up new servers, and solving connectivity issues. Ortmann personally participated in and directed, and profited from, the infringing actions of Megaupload Limited, as alleged in this complaint. In 2010 alone, Ortmann received more than $9 million from his involvement with Megaupload Limited.

23.     Bram van der Kolk ("van der Kolk"), aka Bramos, is a resident of both the Netherlands and New Zealand, and is a Dutch citizen. Van der Kolk, as the director and sole shareholder of Mindpoint International Limited LLC, effectively owns 2.5% of Megaupload Limited. Van der Kolk oversaw programming on Megaupload, as well as the underlying

network infrastructure of the site, oversaw the selection of featured videos that were posted on

Megavideo.com, and at one time was responsible for managing the Uploader Rewards program.

Van der Kolk also was responsible for responding to copyright infringement takedown notices

sent to Megaupload. Van der Kolk personally participated in and directed, and profited from, the

infringing actions of Megaupload Limited, as alleged in this complaint. In 2010 alone, van der

Kolk received more than $2 million from his involvement with Megaupload Limited.

**Defendants' Infringing Conduct**

### A. *Basic Operation of Megaupload*

24.     Megaupload amassed the millions of popular content files that it hosted on its

servers and offered to the public for download by openly encouraging and paying users to upload

these files. Any Internet user who went to the Megaupload website could upload a computer file,

whether or not the user registered as a member. When the upload was completed, Megaupload

reproduced the file on at least one computer server it controlled and provided the user with a

Uniform Resource Locator ("URL") "link" beginning with "megaupload.com." The uploader

could then propagate the link broadly over the Internet, so that anyone interested in downloading

or otherwise accessing a copy of the file could easily find it on Megaupload's servers.

25.     Any user who had the URL link could access and download the associated

content from Megaupload's servers. By "clicking" the URL link (or copying it into any web

browser), the user was taken to a "download page" on the Megaupload website that allowed the

user to download a copy of the file from a computer server controlled by defendants.

26.     To conceal the scope of infringement occurring on the Megaupload website,

defendants did not provide users with a searchable index of files available for download from the

Megaupload website (although defendants themselves had access to such an index). Instead,

8

defendants relied on numerous third party "linking" sites to host, organize, and promote URL links to Megaupload-hosted infringing content, including plaintiffs' copyrighted works. Such linking sites made infringing content broadly and easily accessible to users by maintaining an index of links to content files organized by category and/or alphabetically by titles of the copyrighted work; some such linking sites also offered search boxes where users could enter queries quickly to find the content they wanted. Many of these linking sites were blatant pirate sites, hosting thousands of links to infringing material. Any visitor could quickly see the widespread availability on many linking sites of links to infringing content on Megaupload. Defendants knew of this open infringement on pirate linking sites and closely tracked the traffic from those sites to Megaupload. Furthermore, defendants provided financial incentives for premium users to post links to these sites through the Uploader Rewards program.

27. Megaupload had complete control of its physical infrastructure (i.e., the servers, databases and software that comprise and control the Megaupload system), as well as the activities occurring on its system. Megaupload physically stored the content files on its servers, keeping track of each content file in sophisticated databases, and could remove or disable access to infringing content files if it chose to do so; it also could prevent content files from being stored in the first place, and from being provided to the general public. Megaupload also maintained the ability to control the activities of users. Indeed, it controlled the activities even of unregistered users, by limiting the frequency and speed of downloads for users who did not purchase "premium" subscriptions. Megaupload also had the ability to terminate users or block their access to the Megaupload site and, in fact, legally reserved the right to do so under its terms of service. Through its infrastructure, Megaupload provided the site and facilities on which the

infringement occurred and had the right and ability to prevent or mitigate the infringing activities occurring on its site.

### B. *Megaupload's Business Model*

28.     Megaupload made money in two ways: premium subscriptions and online advertising. Megaupload charged "premium" users subscription fees ranging from a few dollars per day up to approximately $260 for a lifetime subscription. In exchange for payment, premium users would receive faster access to infringing files, including plaintiffs' copyrighted works, on defendants' computer servers. Premium users of the site were able to download and upload files with few, if any, limitations. Furthermore, they were able to use Megaupload's video-streaming website, Megavideo.com, to watch unlimited amounts of the content on Megaupload's servers. Defendants collected subscription fees of more than $150 million from premium users during Megaupload's existence.

29.     Defendants encouraged all non-paying users to buy premium subscriptions by offering them much faster download times, which would otherwise be slower for large files such as full-length movies and episodes of television shows. Defendants also offered premium subscribers unlimited streaming on Megavideo.com, whereas non-paying users were limited to watching 72 minutes at a time, which effectively prevented non-paying users from viewing a full-length movie in one sitting.

30.     The content for which premium users were willing to pay was overwhelmingly infringing. It was this popular, pirated content, available for download at the click of a button, that defendants used as the draw to attract users, which not only increased premium subscription fees, as new users were converted into premium subscribers, but also increased online advertising revenues.

31.     With respect to online advertising, the infringement-driven traffic on Megaupload and its associated websites increased the volume of online advertising impressions and transactions, leading to higher revenues.  The increased traffic also enabled defendants to charge advertisers higher rates.  Online advertising on Megaupload and its associated websites, which was heavily dependent on the popularity of copyright infringing content to attract website visits, yielded more than $25 million for defendants.

32.     In these ways, Megaupload's business model critically depended on attracting users to download high-value copyrighted content, such as plaintiffs' copyrighted works.

C. *Defendants Actively Encouraged Users to Upload Infringing Content.*

33.     To ensure a vast and ever-growing supply of popular copyrighted content to which they could sell premium access, defendants paid users to upload popular content to Megaupload's servers.  Defendants' Uploader Rewards program promised premium subscribers cash and other financial incentives if they uploaded popular works, primarily copyrighted works, to Megaupload's servers.  The rewards program also encouraged users to publicly promote links to that content, so that the content would be widely downloaded.

34.     Although the Uploader Rewards program's financial incentives changed over the life of Megaupload, during the time period most relevant to this complaint, defendants offered one reward point each time that a user's file was downloaded, and offered the user rewards according to the following reward point totals:

            10,000 reward points:  One month premium membership

            50,000 reward points:  6 months premium membership

            100,000 reward points:  One year premium membership + $100 USD

            500,000 reward points:  Lifetime premium membership + $500 USD

11

1,000,000 reward points:  $1,500 USD

5,000,000 reward points:  $10,000 USD

35.     These financial incentives were designed to encourage both uploading and
promotion of popular copyrighted entertainment content.  That infringing content acted as a
"draw" to attract millions of downloading users, to whom defendants could sell premium
memberships, and to whom defendants could also display online advertising.

**D. Defendants Impeded Copyright Owners' Efforts to Remove Infringing Content and
Also Failed to Take Simple Steps to Limit Infringement.**

36.     Defendants provided an "Abuse Tool" that purportedly would allow a copyright
holder to remove or completely disable access to copyright-infringing files on Megaupload's
servers.  The Abuse Tool allowed copyright holders to enter specific URL links to infringing
copies of their copyrighted content of which they were aware.  Defendants represented to
copyright holders that, upon receipt of a URL link through the Abuse Tool, defendants' systems
would then remove, or disable access to, the infringing file associated with that URL link.  For
example, defendants told copyright holders that the Abuse Tool gave them "direct deletion
rights," which permitted the rights holders to "take files and films offline immediately."
Similarly, defendants represented that Megavideo was "one of the few online video communities
that ma[de] it impossible to fraudulently host full-length feature movies due to a human-assisted
automatic detection/deletion mechanism."

37.     The Abuse Tool did not actually function in the manner defendants represented.
If the infringing file on defendants' servers had more than one URL link associated with it,
which was often the case, then in response to a URL link reported by a copyright holder through
the Abuse Tool, defendants would delete only that particular URL link itself, and would leave
the other links and the infringing file in place on Megaupload's system, so that the infringing file

12

continued to be accessible to the general public. The purpose of this approach was to misrepresent the nature of the Abuse Tool, frustrate copyright owners' use of it, and ensure that the most popular infringing files would continue to be broadly available on Megaupload for download.

38.     By intentionally hampering the effectiveness of the Abuse Tool, and by failing to take simple measures to stop, or substantially mitigate, the massive infringement occurring on Megaupload, defendants ensured that Megaupload's massive library of popular, infringing entertainment content remained available and accessible to users, despite copyright owners' efforts to protect their content. Defendants engaged in this conduct because Megaupload's business model depended on widespread copyright infringement.

39.     Megaupload could have prevented large-scale infringement of copyrighted content by implementing account restrictions, such as requiring files to be password-protected, so that only the account-holder (or those individually authorized by the account-holder) could access copies of the files uploaded by that account-holder. Similarly, Megaupload could have limited account-holders to accessing files on particular devices, and/or could have allowed only one person to access a particular file at a time. Instead, Megaupload designed its URL links so that anyone who could locate the link could access the linked-to content at any time on any device.

40.     Megaupload could also have implemented various readily available and effective technological solutions (including, without limitation, automated filtering using digital fingerprinting-based content-identification technology) to identify and prevent infringement of copyrighted content. Megaupload chose not to do so. And although Megaupload had implemented a technology called "MD5 hash" filtering to identify and block uploads of various

types of illicit content, Megaupload chose not to deploy that technology to identify and block infringing uploads of copyrighted works that had already been subject to takedown notices by plaintiffs and other copyright holders.

41.    Furthermore, Megaupload could have reduced and deterred infringement by taking action to terminate Megaupload users who were blatant or repeat infringers. Megaupload had the ability to readily identify users who uploaded the infringing content identified in takedown notices submitted by copyright owners. Megaupload kept detailed records of such users for purposes of compensating them through the Uploader Rewards program. Rather than terminate such infringing users, Megaupload compensated them for their infringement. For example, even though defendants received more than 85 notices regarding a particular user's infringing uploads, defendants paid that user $3,400 pursuant to the Uploader Rewards program.

42.    Indeed, defendant van der Kolk readily acknowledged that Megaupload's "growth [was] mainly based on infringement," and so terminating repeat infringers would be "counter productive [sic] and very costly."

43.    In sum, defendants did not take any of the simple, meaningful steps they could have taken to curtail infringement because they wanted and needed that infringement to make their illegal business profitable.

E. *Megaupload Was Used Overwhelmingly for Copyright Infringement and Defendants Knew It.*

44.    Given defendants' active inducement of infringement, it was entirely foreseeable that significant amounts of unauthorized copyrighted material, including plaintiffs' copyrighted works, would be readily available to the public on Megaupload. The availability of this copyrighted content made Megaupload enormously popular. At one point Megaupload

accounted for four percent of all Internet traffic.  The massive infringement on Megaupload was unmistakable, and defendants had full knowledge of it.

### F. *The Individual Defendants Personally Directed, Participated In, and Benefitted from the Infringement on Megaupload.*

45.    The individual defendants personally directed and participated in, exercised control over, and benefited from the specific infringing and infringement-inducing conduct described above, which resulted in the massive infringement of plaintiffs' copyrights.  This includes, but is not limited to, the adoption of a business plan dependent upon massive copyright infringement; the design and implementation of the Uploader Rewards program, which actively encouraged copyright infringement; the design and implementation of the Abuse Tool in a way that was intended to frustrate copyright holder enforcement efforts; and the refusal to implement readily-available technologies and procedures to mitigate the infringement.

46.    The individual defendants also themselves made and uploaded to Megaupload infringing copies of popular, copyrighted works, including plaintiffs' television shows and movies, without authorization from the copyright holders.  The individual defendants also downloaded from Megaupload infringing copies of popular, copyrighted works, including plaintiffs' works, without authorization from the copyright holders.

### Claims For Relief

### Count I – Direct Infringement of Copyright
### (Against All Defendants)

47.    Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 46 as if fully set forth herein.

48.     Plaintiffs have properly registered and own or control the copyrights and/or exclusive rights under copyright to thousands of major motion pictures and television shows, including but not limited to the illustrative works identified in Exhibit A hereto.

49.     Without authorization from any plaintiff, or right under law, defendants Megaupload Limited, Vestor Limited, Dotcom, Ortmann, and van der Kolk, through their operation of Megaupload and associated websites, have directly infringed thousands of plaintiffs' copyrighted works, including those listed in Exhibit A hereto, by providing unauthorized copies of those works to users in violation of the Copyright Act, 17 U.S.C. § 106.

50.     Defendant Megaupload Limited is directly liable for these acts of infringement under the Copyright Act. The infringing files resided on servers controlled by Megaupload Limited. Megaupload Limited caused and effected the infringing acts of providing copies of those works to its users, and promoted additional infringement by providing the uploading user a URL link that allowed anyone with the link to access the file. In addition, as set forth above, Megaupload Limited played an active role in ensuring that it had the most popular content on its servers, that the URL links to those infringing content files were widely disseminated on the Internet, and that the links were advertised and promoted by pirate linking sites, so that the maximum number of Megaupload users would access the infringing content. Thus, Megaupload Limited did not merely respond to user requests in a passive, content-neutral, and automated manner. To the contrary, as set forth above, Megaupload Limited was, during the operation of Megaupload, actively involved in attracting and storing countless copies of infringing content, and making that content broadly available and accessible to the public at large. It further exercised active control over the process of providing that content by regulating the volume and speed of transmissions to users who had not yet purchased "premium" subscriptions. In these

16

and other ways, Megaupload Limited actively engaged in the infringement of plaintiffs' copyrighted works.

51.     Megaupload Limited also made unauthorized copies of plaintiffs' copyrighted works, including those listed in Exhibit A hereto, and stored them on its own servers in violation of the Copyright Act, 17 U.S.C. § 106.  These unauthorized copies were not made by or at the request of Megaupload users, but rather through the decisions and actions of Megaupload Limited, for its own business purposes.

52.     Defendant Dotcom is jointly and severally liable for each act of Megaupload Limited's direct infringement because he personally directed and participated in, and benefitted from, Megaupload Limited's infringing conduct as alleged herein.  Dotcom supervised the development of the Megaupload site and its associated websites, and has been directly, actively, and personally involved in Megaupload Limited's infringing activities.

53.     Defendants Vestor Limited, Ortmann, and van der Kolk are likewise liable for the acts of infringement identified above for acting in concert with defendants Megaupload Limited and Dotcom in operating the Megaupload website, and for personally directing, participating in, and benefiting from Megaupload Limited's infringing conduct as alleged herein.

54.     Defendants Dotcom, Ortmann, and van der Kolk are also directly liable for the infringement of plaintiffs' copyrighted works, including those listed in Exhibit A hereto, by making and uploading and by downloading copies of those works to and from Megaupload without authorization from the copyright holders.

55.     The foregoing acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to plaintiffs' rights.

56.     As a direct and proximate result of defendants' infringement of plaintiffs' exclusive rights under copyright, plaintiffs are entitled to damages as well as defendants' profits pursuant to 17 U.S.C. § 504(b).

57.     Alternatively, plaintiffs are entitled to the maximum statutory damages, in the amount of $150,000 per infringement, pursuant to 17 U.S.C. § 504(c), or such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

58.     Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## Count II – Secondary Infringement of Copyright
### (Against All Defendants)

59.     Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 58 as if fully set forth herein.

60.     Users of Megaupload and associated websites have directly infringed plaintiffs' copyrights, including without limitation those copyrighted works identified in Exhibit A hereto, by uploading, downloading and otherwise accessing works owned by plaintiffs through Megaupload and associated websites, without authorization from any plaintiff, or right under law, in violation of the Copyright Act, 17 U.S.C. § 106. Defendants are liable as secondary infringers under the Copyright Act for each act of direct infringement of plaintiffs' works by Megaupload users.

61.     Defendant Megaupload Limited is liable under the Copyright Act for inducing the infringing acts of Megaupload users. Megaupload Limited operated Megaupload and provided the website and service to its users, with the object of promoting the use of Megaupload to infringe plaintiffs' copyrighted motion pictures and television programs, among other types of copyrighted content, as shown by Megaupload Limited's clear expression and other affirmative

steps to foster infringement.  Megaupload Limited is therefore liable for inducing Megaupload users to directly infringe plaintiffs' copyrighted works, including those listed in Exhibit A hereto, in violation of the Copyright Act, 17 U.S.C. § 106.

62.    Megaupload Limited is separately liable under the Copyright Act for the infringing acts of Megaupload users as a contributory copyright infringer.  Megaupload Limited had actual and constructive knowledge of massive copyright infringement of plaintiffs' copyrighted works by Megaupload users, including, without limitation, by means of repeated notices by plaintiffs and other copyright holders.   Indeed, Megaupload Limited had full knowledge that Megaupload was being used overwhelmingly to infringe the rights of copyright owners, including plaintiffs.  Despite having that knowledge, Megaupload Limited continued to contribute materially to that infringement as set forth above.  Without the active and material contributions from Megaupload Limited, the massive infringement complained of herein could not have taken place.  Megaupload Limited is therefore contributorily liable for Megaupload users' direct infringement of plaintiffs' copyrighted works, including those listed in Exhibit A hereto, in violation of the Copyright Act, 17 U.S.C. § 106.

63.    Megaupload Limited is separately liable under the Copyright Act for the infringing acts of Megaupload users as a vicarious copyright infringer.  Megaupload Limited had the right and ability to supervise and control Megaupload users' infringing activity as set forth above, and derived a financial benefit directly attributable to its users' copyright infringement, including infringement of plaintiffs' copyrights.  Copyrighted works acted as a draw that attracted both paying users and advertising to the Megaupload website and its associated websites.  Megaupload Limited is therefore vicariously liable for Megaupload users' direct

infringement of plaintiffs' copyrighted works, including those listed in Exhibit A hereto, in violation of the Copyright Act, 17 U.S.C. § 106.

64.     Defendant Dotcom is jointly and severally liable for each act of infringement for which Megaupload Limited is liable because he personally directed and participated in, and benefited from, Megaupload Limited's infringing conduct as alleged herein.

65.     Defendants Vestor Limited, Ortmann, and van der Kolk are likewise liable for the acts of infringement identified above for acting in concert with defendants Megaupload Limited and Dotcom to operate the Megaupload website and for personally directing, participating in, and benefiting from Megaupload Limited's infringing conduct as alleged herein.

66.     The foregoing acts of infringement by defendants have been willful, intentional, and purposeful, in disregard of and indifferent to plaintiffs' rights.

67.     As a direct and proximate result of defendants' infringement of plaintiffs' exclusive rights under copyright, plaintiffs are entitled to damages as well as defendants' profits pursuant to 17 U.S.C. § 504(b).

68.     Alternatively, plaintiffs are entitled to the maximum statutory damages, in the amount of $150,000 per infringement, pursuant to 17 U.S.C. § 504(c), or such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

69.     Plaintiffs further are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

WHEREFORE, plaintiffs pray for judgment against all defendants as follows:

A.     For all damages to which plaintiffs may be entitled, as well as defendants' profits, in such amounts as may be found. Alternatively, at plaintiffs' election, for statutory damages in the maximum amount allowed by law.

B.      For prejudgment interest according to law.

C.      For plaintiffs' attorneys' fees, and full costs and disbursements in this action.

D.      For such other and further relief as the Court may deem proper and just.

## DEMAND FOR A JURY TRIAL

In accordance with Fed. R. Civ. P. 38, plaintiffs demand a trial by jury on all issues so triable.

Dated: April 7, 2014              By:  _____

JENNER & BLOCK LLP
Julie M. Carpenter
Kenneth L. Doroshow (*pro hac vice forthcoming*)
Scott B. Wilkens (*pro hac vice forthcoming*)
Erica L. Ross (*pro hac vice forthcoming*)
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
Phone: 202-639-6000
Fax: 202-639-6066

*Attorneys for Plaintiffs*